THE LEHIGH VALLEY RAILROAD COMPANY, appellants,

*v.*

HENRY McFARLAN and others, respondents.

1. The appropriate relief against successive suits by the same plaintiff for damages arising from an injury which is continuous, is by application for the consolidation of actions, or for a stay of proceedings, and not by bill in chancery, unless the right in controversy has once been determined adversely to the plaintiff.

2. A bill of peace, enjoining a litigation at law, is allowable only when the complainant has already satisfactorily established his right at law, or where he claims a general and exclusive right, and the persons who controvert it are so numerous that the endeavor to establish the right by actions at law would lead to vexatious and oppressive litigation, and renders an issue under the direction of the court indispensable to embrace all the parties concerned, and to avoid multiplicity of suits.

3. It is not indispensable that the defendants shall have a co-extensive common interest in the right in dispute, or that each shall have acquired his interest in the same manner or at the same time; but there must be a general right in the complainant, in which the defendants have a common interest, which may be established against all who controvert it, by a single issue.

4. The rule with regard to multifariousness, whether arising from the misjoinder of causes of action, or of defendants therein, is not an inflexible rule of practice or procedure, but is a rule founded in general convenience, which rests upon a consideration of what will best promote the administration of justice without multiplying unnecessary litigation on the one hand, or drawing suitors into needless and unnecessary expense on the other.

5. The Morris canal enters into and crosses the Rockaway river at Dover. The crossing is effected by means of a dam in the river, which holds the water at the place of crossing at a height suitable to carry boats across the river and to supply a head of water in the lower level of the canal. M. is the owner of a rolling-mill situate on the Rockaway river and driven by its waters, which, after passing the waterwheel, are discharged into the river above the canal dam. H. is the owner of a grist-mill, saw-mill and forge situate on the river below the canal dam and driven by the waters of the river. V. and W. were the lessees of H.'s mills and forge. M. sued the company for injuries arising from back-water upon the wheel of his rolling-mill. H. and his tenants also brought suits to recover damages for diversion of the water from the mills and forge. The company filed a bill of peace, to enjoin the prosecution of said suits, and for the determination of the

Lehigh Valley R. R. Co. *v.* McFarlan.  •

rights of the parties respectively in one suit, to be prosecuted under the direction of the court of chancery. The charter of the company authorized the appropriation of private property to its use without compensation first made, and gave to individuals who were injured thereby a right of action to recover compensation for their injuries.— *Held*, that there did not appear to be such a unity, either in the grounds on which the several actions of the defendants rested, or in the defences proposed to be made thereto, as would make a bill of peace, and an issue thereunder, the appropriate method of settling the questions involved.

On appeal from a decree of the chancellor, reported in *Lehigh Valley R. R. Co.* v. *McFarlan, 3 Stew. 135.*

*Mr. Thomas N. McCarter,* for the appellants.

I. The authorities are abundant to show that, in such a case, equity will interfere to prevent multiplicity of suits. *Kerr on Inj. p. 135* §§ *49, 50 ; 2 Story's Eq.* §§ *853, 854 ; High on Inj. p. 35* § *53 ; Eden on Inj. (Wheeler's Am. ed.) pp. 416, 417 ; New Elme Hospital* v. *Anderson, 1 Vern. 176 ; Lord Tenham* v. *Herbert, 2 Atk. 483 ; Phillips* v. *Hudson, L. R. (2 Ch. App.) 243 ; Sheffield Water Works Co.* v. *Yeomans, L. R. (2 Ch. App.) 8 ; Trustees of Huntington* v. *Nicoll, 3 Johns. 602 ; Nicholl* v. *Huntington, 1 Johns. Ch. 166–175 ; Cross* v. *Burcham, 1 Black (U. S.) 352–358 ; Eldridge* v. *Hill, 2 Johns. Ch. 281 ; Powell* v. *Powis, 2 You. & Jer. 158,* and cases cited in note ; *Thompson* v. *Engle, 3 Gr. Ch. 271.*

The chancellor, in his opinion, relies largely on the case of *Eldridge* v. *Hill, 2 Johns. Ch. 281,* as authority for his position in this case. That was a controversy between two individuals only, and, although the complainant was harassed by successive suits, the chancellor held that, because the controversy was between two individuals only, a bill of peace to prevent multiplicity of suits would not be allowed. It is respectfully submitted that, even in that case, equity should have interfered to prevent oppressive and vexatious litigation. Nothing is more common than for courts of equity to entertain bills for account and injunction in cases

of waste, and in other cases, to prevent multiplicity of suits, where the dispute is between two individuals only (see *1 Story's Eq.* §§ *517, 518*), and that, too, when the title and even the possession is in dispute. But this is not a mere dispute between two individuals. It is between a great corporation exercising franchises of a public nature, in connection with a great public work, on the one hand, and a number of persons who have brought eight suits at law, when the real dispute in each is precisely the same. There is no precise number of persons requisite to give the court jurisdiction; the whole matter is within the sound discretion of the court.

The learned chancellor cites, with approbation, the following language of the supreme court of Massachusetts, in *Ballou* v. *Inhabitants of Hopkinton, 4 Gray 324:* "In regulating the rights of mill-owners and others in the use of a stream, whenever numbers of persons are interested, equity is able, by one decree, to regulate their respective rights, to fix the time and manner in which water may be drawn, and within what limits it shall or shall not be drawn by all parties respectively, and thus it is peculiarly adapted to the relief sought against such alleged nuisance and disturbance, and affords a more complete and adequate remedy than can be afforded by one or more suits at law." *Lehigh Valley R. R. Co.* v. *Society &c., 3 Stew. 162.*

Nor does it excuse the oppressiveness of the litigation of which we complain, that complainants removed some of the suits to the United States circuit court. There is no dispute but that such removals were proper and lawful, and the court can readily see how it was necessarily and properly exercised in cases such as these. Complainants had the same right to remove the causes to the national tribunal that defendants had to sue in the local courts. The exercise of such a legal right cannot excuse conduct on the part of defendants which would otherwise be oppressive and inequitable, nor will this court visit any penalty or disability on the party who exercises such right.

Nor is it any answer to our claim to say that the suits of defendants, sought to be enjoined, are mere "skirmishing for position," as the chancellor terms it.   The courts of this state are not maintained for any such purpose, and the suggestion that the process and machinery of our tribunals of justice may be used for any such purpose, shows an additional reason why such conduct should be restrained.

II.  As to multifariousness.

The right of complainant is common against all the defendants.   The right of each defendant rests on a common foundation, viz., the right as riparian owner to enjoy the use of water on his land without hindrance or diversion. Thus far the suit is clearly not objectionable.   But the claim is made that the complainant alleges an equitable defence to McFarlan's claim that does not apply to the claims of the other defendants.   This is not a valid objection.   See *N. Y. & N. H. R. R. Co.* v. *Schuyler, 8 Abb. Pr. 66 ; S. C., 17 N. Y. 592, 604 ; Powell* v. *Powis, 1 You. & Jer. 158, 165,* cited above; see note, also.   See, also, *Brinkerhoff* v. *Brown, 6 Johns. Ch. 139 ; Hammond* v. *Hud. Riv. Machine Co., 20 Barb. 378 ; Boyd* v. *Hoyt, 5 Paige 78 ; Spaulding* v. *McGovern, 10 N. B. R. 188 ; Way* v. *Bragaw, 1 C. E. Gr. 213 ; Randolph* v. *Daly, 1 C. E. Gr. 313 ; Hicks* v. *Campbell, 4 C. E. Gr. 183 ; Marselis* v. *Morris Canal Co., Sax. 31.*

The cases of *Brinkerhoff* v. *Brown, Hammond* v. *Hudson River Machine Co., Boyd* v. *Hoyt,* above cited, and the case of *Fellows* v. *Fellows, 4 Cow. 582,* show that when maintaining a bill will prevent a multiplicity of suits, a demurrer for multifariousness is not looked on with favor.   See *Story's Eq. Pl.* §§ *124, 271, 278 ; Mayor of York* v. *Pilkington, 1 Atk. 282.*

III.  The same argument and authorities which show that the demurrer will not lie against this bill, also sustain the point that there is equity in the bill to sustain the injunction, and will defeat the motion to dissolve on that account.

IV. The only remaining question is, how the right to maintain the injunction is affected by McFarlan's answer? This motion is on behalf of McFarlan alone. McFarlan is already litigating the very question in this court. His denial of our equity is not of his own knowledge. The other defendants can derive no benefit from his answer. There is not in Mr. McFarlan's answer any such denial of the equity of the bill as will entitle him to a dissolution of the injunction.

*Mr. F. T. Frelinghuysen,* for appellants.

The defendants, excepting McFarlan (who has answered), demur to the bill because of the alleged misjoinder of McFarlan, because of the multifariousness of the bill, and because of want of equity in the bill, and those demurring also move to dissolve the injunction for want of equity in the bill.

I. The case of those demurring considered.

(*a*) The Halseys could not take advantage of the misjoinder of McFarlan, if it existed. " If the misjoinder is of parties defendant, those only can demur who are improperly joined." *Story's Eq.Pl.* § *544*. " A joinder of too many persons as defendants when there is no misjoinder of subjects, is not a ground of demurrer by any one of them against whom the complainant states a good cause of action." *New Haven R. R. Co.* v. *Schuyler, 17 N. Y. 592.* If the demurrer means that the Halseys are misjoined, that is simply denying the equity of the bill as against them. That we will consider presently.

(*b*) Of multifariousness. " Multifariousness is joining in one bill several *matters* which are distinct against one defendant, or against several defendants." *Story's Eq. Pl.* § *271.* It does not depend on the number of defendants, but on the *matter* set up in the bill.

The bill is filed by the complainants for the single purpose of protecting their dam across the Rockaway at Dover. If the Halseys, because the dam diverted the water, and McFarlan, because the dam backed water on his water-

Lehigh Valley R. R. Co. *v.* McFarlan.

wheel, threatened to tear down the dam, a bill to enjoin both the Halseys and McFarlan would not be multifarious, and would not be so although they had different reasons for threatening to abate the dam. Neither is a bill multifarious which seeks to enjoin the same parties when they seek to abate the dam by a multitude of vexatious suits. Whether the suits are vexatious, we will see presently.

In *Mayor of York* v. *Pilkington, 1 Atk. 282, 284; Story's Eq. Pl. § 124 125,* the complainant filed a bill to quiet his right of fishing in the river Ouse (complainant here files a bill to quiet his right to essential works of the Morris canal), against a number of defendants who claimed several rights as lords of manor and occupiers of adjacent lands (the defendants here all claim in severalty, but all as occupiers of adjacent lands, and there is less diversity in this case). Objection was made (as here) that there was no privity between the defendants. On demurrer, the court sustained the bill, on the ground "that there was a right of sole fishery asserted by the complainant against *all the defendants,* and so here. Where the case made by the bill is so entire that it cannot be prosecuted in several suits, and yet each of the defendants is a *necessary party* to some part of the case as stated, neither of the defendants can demur for multifariousness, or for a misjoinder of causes of action in some of which he has no interest." *Spaulding* v. *McGovern, 10 N. B. R. 188; Randolph* v. *Daly, 1 C. E. Gr. 313.*

A bill is not demurrable for multifariousness which unites several matters distinct in themselves, but which *together* make up the complainant's equity, and are necessary to complete relief. *Hicks* v. *Campbell, 4 C. E. Gr. 183.* A bill is not to be treated as multifarious, even because it joins two good causes of complaint growing out of the same transaction, where all the defendants are interested in the same right. *Story's Eq. Pl. § 282.* Here all the defendants claim that their identical riparian right as land owners on the Rockaway, is impaired by the one dam across the Rockaway.

It is well settled that when, as in this case, there is one person defending one right against many claiming against it, equity will interfere and determine the right in order to prevent vexatious litigation and a multiplicity of suits. *High on Inj. p. 36* § *53; Tenham* v. *Herbert, 2 Atk. 483; Wood* v. *Monroe, 17 Mich. 238.*

(*c*) We now consider the want of equity, both as a cause of demurrer, and as a reason for dissolving the injunction on the motion of those who demur.    The demurring defendants, by demurring, admit—

(1) That as much water which did not naturally flow to the Rockaway was brought into that river as was diverted therefrom by the dam, in consequence whereof no diminution in the water in said Rockaway river below the dam at Dover was occasioned by the said dam.

(2) They admit that Joseph Jackson and John D. Jackson, under whom the defendants hold, gave the canal company, under which the complainants hold, a grant in fee in the nature of a perpetual lease to maintain the dam and flash-boards.

(3) They admit an adverse enjoyment for more than twenty years, of the dam and flash-boards, by complainants, and those under whom they claim.

(4) They admit that their suits are brought for diverting the water from the Rockaway at Dover, and that eight suits at law (five by the Halseys and three by the McFarlans) have been brought therefor since September, 1876, none of which has been tried.    The eight suits are vexatious, not only by reason of their multiplicity, but because it is true, as admitted, that the complainants have the right to the water of the Rockaway, and that they, the defendants, are not in any way damaged.    Of course, their suits are only vexatious.

(*d*) But the complainants have this further equitable defence of the dam, which cannot be set up at law:    Should the complainants plead to the Halseys' suits at law, the general issue and the statute of limitations (and they could plead

Lehigh Valley R. R. Co. *v.* McFarlan.

nothing more), and should the plaintiffs at law prove that for twenty years, to wit, from 1852, there had been a certain continuous flow in the river, and that, as laid in the declaration in 1872, the water had been diverted and diminished by the complainants, the plaintiffs would recover. *Archbold's Nisi Prius 326.* And yet they would, *in equity*, have no right to recover, for the reason that, prior to 1852, when the presumptive right began, the complainants, being the defendants at law, had, by legislative authority, saved water at Hopatcong and elsewhere, and lawfully (according to the adjudications of this state) turned the same into the Rockaway, and are under no greater obligation to keep the excess of water in the Rockaway uniform, than to have a uniform depth of water in their canal. Had the declarations alleged that the complainants had diverted the natural flow of the river, or had it complained of a diversion of water which of right ought to have flowed in said river, proof of uniform flowage for twenty years would at law be held to be proof of such right. For form of declaration see *2 Chit. Pl. (17th ed).*

II. Mr. McFarlan's motion to dissolve on his answer, considered.

The dam was constructed in 1828, and, in the language of the answer, " was suited in height to the old canal and the boats first in use thereon." The answer further says, that the canal was originally constructed to be navigable by boats bearing only eighteen tons, and drawing three feet of water. In 1845 the canal was made five feet wider and one foot deeper. It is quite clear that Mr. McFarlan has no claim against the canal company, but we are told that we can show our presumptive title at law, and we answer :

III. That there are abundant reasons why this question between the canal company and McFarlan and the Halseys should be determined in equity, and that the complainants can not, according to law, without a hearing on the

evidence, be turned out of this court.    Those reasons are these :

(1) The canal company has a right to equitable relief against a multiplicity of suits.

(2) The Halseys, by their demurrer, admit that they have no cause of action, because they admit that there is no diminution in the waters of the Rockaway, and yet multiply suits for diminution; admit that the canal company have a grant in fee that binds them; admit the adverse enjoyment for thirty years by the canal company.

(3) As to the Halseys' suits, the canal company has the right to set up the equitable right to diminish a flow in the Rockaway which may have flowed in that river twenty years, and such equitable right can only be set up in a court of equity.

(4) It is submitted that it is the province of this court to retain jurisdiction of the question, because of its public character.

The canal is a valuable public highway in which all the people are interested; it is a unit.    Take the water out of it at Dover, and it is valueless.    It is admitted that the company has a right to a dam at Dover.    It is admitted that, in low water, it has, for thirty years, placed flash-boards on that dam.    This court can, and a court of law can not, see to it that a public work is not injured, or public travel interrupted, while, at the same time, private rights are protected.    The franchise of the state is delegated for the benefit of the people, and can be as much impaired by suits treating the company as trespassers as by open violence.    *High on Inj. 318* §§ *570, 571, 572 ; Lehigh Valley R. R. Co.* v. *Society &c., 3 Stew. 145.*

(5) Mr. McFarlan has sought this court, and he cannot deny its jurisdiction.    The canal company filed a bill against McFarlan, to enjoin him from removing the flash-boards.    McFarlan filed a cross-bill, asking the court to determine " whether the company had the right to main-tain, on a permanent dam, the flash-boards or some equiva-

lent." Mr. McFarlan must patiently listen for the answer of the court. *High on Inj.* § *47 ; Conover* v. *Mayor &c., 25 Barb. 531 ; Crane* v. *Bunnell, 10 Paige 333.*

(6) It appears, by the bill and answer, that the canal, in 1845, was deepened about a foot by raising the banks, and so raising the surface of the water. This, of course, made the raising of the dam indispensable. And the defendant McFarlan admits that the flash-boards were used in 1845, and he stands by and sees this vast expenditure dependent on the elevation of the water in the canal by means of the dam, and is equitably estopped from suing the canal company for damages as trespassers. All he could ever have demanded was compensation. *Trenton Water Power* v. *Chambers, 1 Stock. 471.*

(7) The case is still stronger. The bill charges, and the answer admits, that McFarlan was a director of the canal company from 1830 to 1833. He remained a director until 1859, excepting out of the period the year 1848. He was a director eighteen years. The bill charges specifically, that he knew all about the use made by the company of the dam and flash-boards, and he, in no manner, denies it; that he participated in the action for the enlargement of the canal, and he does not, in any manner, deny it.

It can hardly be claimed that a director can expend his constituents' investments in effecting a public work, and then treat the work as a nuisance and the company as trespassers. Neither can it be claimed, after thirty-four years, from 1845 to 1879, that the director who attended principally to the financial matters of the company, is entitled to an offer of compensation.

(8) This decree should be reversed, because, while it was argued before the chancellor, a case involving the right to the flash-boards, but differing from this, was argued before the vice-chancellor, and erroneously, we insist, by him decided against the canal company's right, and the chancellor, having signed the decree adverse to the right of the

canal company, as advised by the vice-chancellor, felt constrained to decide the case argued before him in the same manner, so that his two decisions should harmonize. The vice-chancellor, who did not hear the argument in the suit against McFarlan and the Halseys, virtually decided it. We submit it is the right of the citizen to have the court that hears a cause decide it.

(9) The case, in view of the charter of the company, shows the multiplicity of suits to be entirely vexatious, having no basis, and that there is nothing to be tried.

The bill avers that the canal was constructed in pursuance of the charter, and that, in constructing the canal at the *locus in quo,* the route was selected therefor, upon which *route* the canal was located and made, and the dam constructed, and upon which route the canal is now operated, all of which is admitted by the answer.

We have, then, the charter and its supplements admitted, that the canal from the Delaware to the Passaic, through Dover, was constructed under it; that, at Dover, the dam was *located* and made on the *route selected.*

The fifth section of the charter gives the authority to make the canal, with its works, and gives the company, with its agents, authority, from time to time, to enter upon lands, whether covered with water or not, for the purpose of surveying the route or routes for the said canal and locating the works. And when the route shall have been fixed upon, which is to be evidenced by depositing a survey thereof in the office of the secretary of state, then it shall be lawful for the company, " at any time, to enter upon and *take possession of and use,* all and singular, such *lands, waters* and streams, *subject* to such *compensation* to be made *therefor* as is *hereafter directed*" (*P. L. 1824 p. 160*). This fifth section does not require the quantity of land to be stated or the height of the dam fixed. The rule was different in *Vail* v. *Morris & Essex R. R. Co., 1 Zab. 189,* and the supreme court, in *Den* v. *The Morris Canal and Banking Co., 4 Zab. 591,* calls attention to the distinction. The manner in

which compensation is to be made is fixed by sections 6 and 20. *Kough* v. *Darcey, 6 Hal. 284; Den* v. *Morris Canal and Banking Co. 4 Zab. 589.*

The court approve the construction thus given the charter of the Morris Canal and Banking Company in *Hetfield* v. *The Central Railroad Company of New Jersey, 5 Dutch. 575.* The suit provided for in section 20, being for compensation of all, direct and indirect, immediate and consequential, injury, whether by actual compensation or remote deterioration. It covers the back-water on McFarlan's wheel. It comes in the place of an assessment, and the damages covered are as extensive. *Van Schoick* v. *Del. & R. Canal Co., Spen. 253.*

(2) The canal company has a charter title to the dam at *its present height,* under the power of eminent domain, and it matters not, on this point, whether the eight inches were added in 1845 or in 1857, for the charter title of the company accrued at once whenever it was. The dam was raised by the company in the exercise of a charter right, and is, as raised, a lawful structure and not a nuisance.

(3) I submit that the case shows, beyond a doubt, that the raising of the dam was in 1845, as an incident to the enlarged capacity of the canal, and this the Halseys, by demurring, admit. The company in this view sets up no lost grant, but a charter title, and the thirty years user of the dam with the flash-boards on, claiming under this title, even were it defective, makes it perfect.

IV. The provision of the charter that the company may take and hold possession under the provisions of the fifth section, subject to compensation, is clearly constitutional. Should it be claimed that it was not, we would answer—

(1) Neither McFarlan nor the Halseys can raise that question, because the dam has existed since 1828, fifty years, and at its present height since 1845, thirty-four years; unquestionably since 1857, and the presumption is that they have received their compensation.

(2) Mr. McFarlan, in any event, could not justify tearing down an ancient dam, which had existed for thirty years, on the ground that the provisions of the law under which it was constructed were unconstitutional, particularly as that law has twice, by the supreme court of the state, when considering the very question of compensation, been decided constitutional. *Kough* v. *Darcey, 6 Hal. 284; Den* v. *Morris Canal, 4 Zab. 589.*

(3) The Morris canal is declared to be, and is in fact, a public highway, and *the state,* under the old constitution, could take private property for the purposes of a highway without any compensation. Property at common law was held under this reserved right in the sovereign. The right is like that of mining and navigating streams, which at common law are reserved. So the constitution of 1844, Art. XI, pl. 16, provides that private property shall not be taken for public use without just compensation, and then adds, " but land may be taken for public highways, as heretofore, until the legislature shall direct compensation to be made." But the property in this case is not taken directly by the state, it is taken by the intervention of a private corporation, and under neither the old constitution nor that of 1844 could land be taken by a private corporation without just compensation. The old constitution of New Jersey made the common law of England the law of this state, and under it a citizen's property could not be taken by a private corporation without just compensation. *Scudder* v. *Trenton Del. Falls Co., Sax. 695.* The old constitution does not require that just compensation be made as a condition precedent to taking the property. And the supreme court, in the two cases last referred to, holds that not necessary. Under the constitution of 1844, because of the express provision of Art. IV, Sec. 7, pl. 9, " private corporations shall not be authorized to take private property for public use, without just compensation first made to the owners," payment of compensation is a condition precedent to the taking. And as in this case the property was taken thirty

.years ago, and has since been enjoyed, the presumption is that the condition precedent was performed. But there is no provision in the old constitution requiring compensation to be *first* made. The change in the constitution has no ·effect on a charter which is a contract made prior to it. The charter of the Morris Canal Company is a contract. *Trustees of Dartmouth College* v. *Woodward, 4 Wheat. 518; Zabriskie* v. *Hackensack R. R. Co., 3 C. E. Gr. 178.* The ·constitution of the United States, Art. I, Sec. 10, provides ·that no state shall pass any law impairing the obligation of ·-contracts. The constitution is a law within the prohibition ·of the constitution of the United States. *10 Wall. 511; R. R. Co.* v. *McClure, 18 How. 331.*

*Mr. H. C. Pitney,* for respondents.

Let us inquire in what cases, and upon what grounds, ·equity will restrain suits at law. *Eden on Inj. p. \*14; 2 Story's Eq. Jur.* § *875; Kerr on Inj. p. \*13; Smithurst* v. *Edmunds, 1 McCart. 413.*

Laying out of view, as we may, for present purposes, the ·causes of bills for discovery in aid of a defence at law, and for the delivering up and cancellation of instruments to which a legal defence may exist, and the like, we may say that the injunction will go to restrain actions at law only in cases where (1) a good cause of action appears at law, and (2) where no good defence at law appears, and (3) where a good equitable defence is shown.

A *prima facie* case at law must be shown, else there is no ·occasion to come into equity. *Kerr on Inj. p. \*17 et seq.; Derbyshire &c. R. R.* v. *Serrell, 2 DeG. & S. 353; Arundel* v. *Holmes, 4 Beav. 325; Simpson* v. *Lord Howden, 3 Myl. & Cr. 99.*

A bill which shows a good defence at law is demurrable. *Kerr on Inj. \*17; High on Inj.* § *46; Perrine* v. *Striker, 7 Paige 598; Morse* v. *Hovey, 9 Paige 197; N. Y. Dry Dock ·Co.* v. *Am. Life Ins. Co., 11 Paige 384; Minturn* v. *Farmers Trust Co., 3 Comst. 498; Morris Canal & B. Co.* v. *Dennis,*

48

*1 Beas. 249; Wooden* v. *Wooden, 2 Gr. Ch. 429; Barnard* v. *Willis, Cr. & Ph. 85; Rawson* v. *Samuels, Cr. & Ph. 161, 170, 178.*

The complainant attempts to set up several such equitable defences. I will consider them separately.

I. It says, that said dam was built before the year 1830 by defendant's father and predecessor in title, and has been maintained ever since by the canal company and complainant for the purposes of the canal, and that a right has, in this manner, by adverse use, accrued to the canal company and complainant to continue to maintain it. This defence is purely a legal one, available at law, and, if true, shows the complainant out of court. Complainant further says that, in the year 1845, the canal company widened and deepened its canal, and from and after that time, to the year 1875, at its free will and pleasure, and without any hindrance or denial by defendant, used flash-boards on said dam &c. To this last allegation we make two answers:

First—We say it shows a legal, and not an equitable, defence; and,

Second—It is denied by the answer under oath, and is but feebly supported by the affidavit annexed to the bill.

A *contentious* use, or one by *leave* or *favor*, will not result in any right. I beg leave to refer to my brief in the other suit between these parties, decided by Vice-Chancellor Van Fleet, and recently before this court, for the reasoning and authorities on this part of the case.

II. It sets up the pendency of a suit in chancery, brought by complainant against defendant in 1875, to restrain defendant from in part abating said dam, and says that the right to maintain flash-boards thereon is involved in that suit. To which I answer: Suppose it is; does that prevent defendant from bringing an action for damages suffered by reason of the maintenance of said flash-boards, *and also for maintaining the permanent structure at an unlawful height?*

Even if we had ourselves filed a bill in this court to abate the dam, such suit would not have been any bar to an action at law to recover damages for its maintenance. *Carlile* v. *Cooper, 3 C. E. Gr. 241; Waters* v. *Cooper, Ibid.* But the action at law here is brought for damages caused by the *whole* structure, and not the flash-boards alone. If we show at the trial that the permanent structure has been maintained higher than complainant has the right to maintain it, we shall recover damages on that account, and prevent the acquisition of the right by force of long user. But, says complainant, you impliedly admitted, in your answer and cross-bill in the former suits, that the permanent structure was lawful. To which we reply, that our pleadings in the former suit will not bear such construction, and, if they do, they are admissions available at law, and will have as much force *there* as *here.*

III. It sets up that defendant was a director in the canal company up to 1859, and knew of certain changes made in the planes of the canal, adapted to the use of larger boats, which required the use of flash-boards on the dam, and acquiesced in such changes. This allegation (except McFarlan's directorship) is not supported by any proof.

But one of the counsel in the court below took ground not broached in the bill, and insisted that McFarlan's assumed acquiescence absolutely barred him from any action at law, and although it was admitted that he was entitled to compensation, yet he could not treat the canal company as a trespasser, so to speak; and *Trenton Water Power Co.* v. *Chambers, 1 Stock. 471;* and *Kough* v. *Darcey, 6 Hal. 237,* and the peculiar character of the canal company's charter, as pointed out in the last case, were relied upon. Now, in answer to this argument, made in writing in the court below, I have to say that it is clear that McFarlan can not be held to have given the canal company a parol license to raise the dam in question, unless he knew that they contemplated raising it, or that they were actually engaged in

raising it, or that the change in the operation of the canal would naturally or necessarily result in raising it. See *De Busche* v. *Alt, L. R. (8 Ch. Div.) 315*. What he did know about it, and how far he did acquiesce in it, appears by the answer, and has been already commented upon. Without admitting any acquiescence or parol license on McFarlan's part, I proceed to consider the effect of a *parol license if it were proved as set out in the bill.*

The case of *Hetfield* v. *R. R., 5 Dutch. 57*, holds, and the case of *Trenton Water Power* v. *Chambers, 1 Stock. 471*, admits, that the supposed parol license or acquiescence is no defence at law; and see the cases cited in the dissenting opinion of Chief-Justice Whelpley, in *5 Dutch. 217*, whose views afterwards prevailed in the court of errors.

But it is contended that the parol license is good in equity after being executed, and that the action of law will be enjoined. Admitting this, for argument's sake, the question arises, *Upon what terms* will chancery enforce the parol license, and restrain the action at law ? And the answer is found in the two cases cited by counsel, viz., *Trenton Water Power* v. *Chambers*, and *Central Railroad* v. *Hetfield, 3 C. E. Gr. 323*. In the first case relief was granted upon the terms *of making compensation.* In the latter case it was asked for upon that distinct ground, and the bill offered to pay what the court should deem a just compensation (*3 C. E. Gr. 325*). To the same effect, *Trenton Banking Co.* v. *McKelway, 4 Hal. Ch. 84.*

There is no pretence in this bill that McFarlan agreed, as was alleged in Hetfield's case, to let the canal company injure his property without being paid for it. *Then the palpable defect of the bill in this case is, that it does not offer to make compensation.* Without such offer, no equity is made out. Equitable suits to enforce parol licenses are in the nature of bills for specific performance, where the complainant must, as in all other cases, offer to do what is equitable.

Even if complainant should offer to make compensation, this court would permit the actions at law to proceed, in order to ascertain how much damage has already been sustained. *Kough* v. *Darcey, 6 Hal. 237; Seward* v. *Morris Canal and Banking Co., 3 Zab. 219*, tried at the Morris circuit twice, in which Seward finally recovered damages against the company on an ordinary declaration for damages by reason of back-water flowage caused by an increase in the height of the dam across the outlet of Lake Hopatcong. *Ryerson* v. *Canal Co. 3 Dutch. 457, 4 Dutch. 97*.

The effect of the 20th and 27th sections of the canal company's charter is to leave McFarlan, in this cause, just where the common law would place him, if the charter had been passed under the new constitution. His remedy is either to abate or apply to equity for an injunction, or, by repeated actions at law, to recover damages caused by back-water. The relations of the parties to each other are precisely the same as that of ordinary citizens. This has always been the view taken by the courts of this state. *Seward* v. *Morris Canal, 3 Zab. 219; Ryerson* v. *Morris Canal, 4 Dutch. 97*.

It seems to me that *Cushman* v. *Smith, 34 Maine 248*, was rightly decided, and gives the clue to a sensible construction of the canal company's charter. The power to enter and take possession before compensation made, was given upon condition that such compensation should be made *within a reasonable time, or upon demand.* Title to land so taken could not, according to the 6th section of the charter, vest in the company until after payment of the amount awarded as a compensation therefor. *And for all incidental and consequential injuries the company are made liable in damages, as often as the same may occur, to be recovered by the common law action appropriate to the case.*

Then, as to the constitutional question. The mere fact that the old constitution did not provide in terms that private property should not be taken for public purposes without compensation made, did not justify the legislature

in attempting to give authority to a corporation to do so. The legislature had no power to give such authority, even when unshackled by written constitutional limitations. *Gardner* v. *Newburgh*, *2 Johns. Ch. 162–166 ; Bonaparte* v. *C. & A. R. R. Co., Bald. C. C. 205, 219 ; Sinnickson* v. *Johnson, 2 Gr. Ch. 374, 2 Harr. 129, 142. Southard* v. *Canal Co., Sax. 518,* is a case involving the construction of the charter under consideration, as applied to a case like the present; and Chancellor Vroom would have granted an injunction as to so much of the land flowed as had not been paid for, if the canal company had not given security. *Sax. 524.* So, in *Society* v. *Canal Co., Sax. 157,* Chancellor Vroom would have granted an injunction if the right to divert had been set up and persisted in, and would not have left the society to its remedy at law.

The charter of the Camden and Amboy Railroad Company, *2 Harr. Comp. p. 284,* is much like that of the Morris Canal Company. Prepayment is not made a requisite to the right of entry and occupation (section 11), but the railroad company holds the land "subject to such compensation to be made therefor as is hereinafter directed," and the amount of the award is made a lien on the lands taken (section 13). Yet an injunction was granted in Bonaparte's case against taking possession until payment was made or secured. The rule laid down by Justice Baldwin was, that the payment of compensation must be simultaneous with the disseizin and possession. See *Cooley's Const. Lim. 560, 561.* But the increase in the dam complained of here, was made after the new constitution was adopted, which must be held to be an amendment or supplement to the canal company's charter, so far as relates to any supposed right in practice to take property without making compensation. And it was such an amendment as the people, in their sovereign capacity, had power to make. It did not "impair the obligation of the contract" contained in the charter, nor did it interfere with any vested rights. It affects only the remedy of both parties. *Cooley on Const. Lim. pp. 285–292,*

*361–367.* Besides, the charter of the canal company does not authorize or contemplate additions to, or alterations of, the original structure of the canal in the nature of new works, such as are now under consideration. They are not covered by the original contract, and when the canal company attempts to execute them, it must do it according to the law of the land, which requires compensation to be made.

However, all the defendant wants is compensation—compensation for damages already sustained, and those hereafter to be sustained. If the court feels disposed to so far favor the complainant as to allow it any relief, it should be, I submit, upon the following terms, or their equivalent:

*First*—Payment of all costs incurred by the defendant in all the suits.

*Second*—An inquiry, by a jury to be impanelled in the Morris circuit, of the damages defendant has already sustained by the maintenance of the dam, and of the injury to his property hereafter to result from its permanent maintenance.

IV. The complainant asks the aid of this court to avoid multiplicity of suits, showing two suits at law by defendant, McFarlan, and six by other defendants. But the slightest consideration will show that the defendant McFarlan is not responsible for the six suits at law brought by the other defendants, and that they are improperly joined with him in this suit. There is no precedent or principle of equity for enjoining a second suit for the continuance of a nuisance, simply because the first has not yet been determined, unless the second is brought so soon after the first, and under such circumstances, as to manifest a disposition to oppress and harass. *Eldridge* v. *Hill, 2 Johns. Ch. 281; West* v. *New York, 10 Paige 539.* I submit, that the removal of the first suit to the federal court, after having voluntarily come into this state court to protect its rights in the premises, was a sufficient excuse, if any were needed, for the bringing of the second suit.

There is not the least pretence that defendant had any-thing to do with, or knowledge of, the making of complain-ant's lease, or in anywise encouraged it, either actively or passively. There is absolutely no ground of estoppel stated against him in this behalf. If the canal company, at the time of the lease, had the right to throw back-water to the height it did, on our wheel and land, it could convey that right to complainant. If it did not have that right, it could not convey it to the complainant. The law is well stated, and the authorities outside this state collected, in *Bigelow on Estoppel pp. 473–577*, and especially at *pp. 500–525*. In England, *Freeman* v. *Cooke, 2 Exch. 654; Clark* v. *Hart, 6 H. of L. Cas. 633; Somerset Canal Co.* v. *Harcourt, 2 DeG. & J. 596.* In New York, *Brinkerhoff* v. *Lansing, 4 Johns. Ch. 70; Dezel* v. *Odell, 3 Hill 215; Corning* v. *Troy I. & N. Works, 39 Barb. 311–321; S. C., 40 N. Y. 191, 203; Rice* v. *Dewey, 54 Barb. 458.* In Alabama, *Hopper* v. *McWhorter, 18 Ala. 229; Owen* v. *Slater, 26 Ala. 547.* In Pennsylvania, *Eldred* v. *Hazlett, 33 Pa. St. 307.* In Connecti-cut, *Taylor* v. *Ely, 25 Conn. 109–119; Merrill* v. *Phelps, 34 Conn. 250.* In New Jersey, *Campbell* v. *Smith, 3 Hal. 140, 182–4; Philhower* v. *Todd, 1 Stock. 312; Erie Railway* v. *D. L. & W. R. R., 6 C. E. Gr. 289, 290; Den* v. *Richman, 1 Zab. 395–403.*

A word in reply to argument in the court below, as to multiplicity of suits as against both sets of defendants. The equity claimed to arise out of McFarlan's three suits, is disposed of by *Eldridge* v. *Hill*, and that line of cases. No declaration was filed in the first suit, and complainant is entitled to a nonsuit. Surely there is no vexation in such a suit. Where the litigation is between two individuals for a continuing nuisance, the bringing of successive actions at law is a recognized mode of effecting the abatement of the nuisance. *Angell on Watercourses § 402; 3 Bla. Com. 220; Caruthers* v. *Fillman, 1 Hayw. (N. C.) 399.* And where, as here, the complainant is claiming an easement by grant or adverse user, as against the natural right, no injunction will

go until the complainant in equity has achieved a decided success at law.  *Carlile* v. *Cooper, 6 C. E. Gr. 576.*  On the contrary, the injunction goes in favor of the plaintiff at law, on the ground that his remedy there is inadequate.

The vice of the argument by which it was attempted to connect and weld McFarlan's with Halseys' suits, is two-fold.

First—As before shown, the right, the exercise of which is claimed as against McFarlan, is different from the right, the exercise of which is claimed against the Halseys.  One is to *divert,* the other is to *dam back.*

Second—The identity of *right* requisite to give equity jurisdiction to collect and consolidate several actions at law, must be identity in the *origin and foundation* of the right, rather than in the *nature* of the right.  This principle is applied in cases where there is a contention between one person on one side and several on the other, and many suits result, all involving one right.  The distinction between the case of several suits between two individuals for a continuance of the same injury, and the case of several suits between one individual on one side and several persons on the other, all involving the same questions, is radical, and must not be lost sight of.  *Crews et al.* v. *Burcham, 1 W. Bl. 352; Sheffield Water Works* v. *Youmans, L. R. (2 Ch. App.) 8; Schuyler Cases, 17 N. Y. 603.*

The opinion of the court was delivered by

Depue, J.

The Morris Canal & Banking Company was incorporated in 1824.  In 1828, it constructed its canal from the river Delaware to the Passaic.  In 1871, the canal and all the franchises and property of the company were leased to the Lehigh Valley Railroad Company.  The summit level of the canal is near Lake Hopatcong, which furnishes the principal supply of water for the eastern division of the canal.  At Dover, in the county of Morris, the canal crosses

the Rockaway river. The crossing is effected by discharging the waters of the canal into the river by means of a lift-lock, and admitting, through a guard-lock on the other side, sufficient water into the lower level to maintain the water therein at a height sufficient for the navigation thereon. To accomplish that purpose, the company placed a dam across the river. The dam, as a permanent structure, was erected when the canal was built, in 1828. In 1845, the company enlarged its canal, and increased its capacity, so as to admit the passage of boats requiring a greater depth of water; and, in order to obtain a suitable depth of water at the place of crossing, and in the lower level, the company placed, on the top of the dam, flash-boards, held in position by iron pins or bolts, to be kept there, as necessity might require, during the boating season. The controversy which has given rise to this litigation, relates to the company's right to the use of these flash-boards.

McFarlan is the owner of a rolling-mill, situate on the Rockaway river, above the canal company's dam. His mill is driven by the waters of the river, which, after passing his water-wheel, are discharged into the river above the canal dam. The Halseys and Mrs. Beach are the owners of a grist-mill, saw-mill and forge and bloomary, situate on the Rockaway river, below the canal company's dam, which works are also driven by the waters of the river. The other defendants, Van Winkle and Hoagland, were lessees of the Halsey mills and forge.

McFarlan, conceiving himself to be injured by back-water upon the wheel of his rolling-mill, sued the complainants to recover his damages. The Halseys and their tenants also brought suits to recover damages for the diversion of the water from the mills and forge, below the canal dam. Thereupon the complainants filed this, a bill of peace, to enjoin the prosecution of said suits, and for a determination of the rights of the parties respectively in one suit, to be prosecuted under the direction of the court of chancery.

Lehigh Valley R. R. Co. *v.* McFarlan.

Upon the filing of the bill, a temporary injunction was granted.

The Halseys demurred to the bill for multifariousness. McFarlan filed an answer, in which the objection to the bill for multifariousness is also expressly taken.

The chancellor, upon hearing upon bill, answer and demurrer, dissolved the injunction, and dismissed the complainant's bill.

The particulars connected with the institution of the said several suits are fully stated in the chancellor's opinion. They need not be repeated here. Suffice it to say that, at the time this bill was filed, eight suits were being prosecuted—two by McFarlan, two by the Halseys, and two by each of their tenants. These suits were all brought in the supreme court of this state. The first of them, brought by McFarlan, was commenced December 30th, 1876, and claimed damages from April 1st, 1872, to the commencement of the suit. The first of the Halseys' suits was begun September 21st, 1876, and, on the same day, the first of the suits of Van Winkle and Hoagland were begun. All these suits the complainant (it being a foreign corporation) removed to the circuit court of the United States for the district of New Jersey. Thereupon, each of the plaintiffs in the said actions brought a new suit, in the supreme court of this state, for damages accruing after the time of the commencement of the first suit.

For the duplication of these actions the complainant is itself responsible. If the suits first commenced had been allowed to remain in the state courts, and fresh suits had been brought by the same parties for damages accruing subsequently, and arising from the same cause, the defendant in such actions could have obtained a consolidation of all the actions brought in the name of the same plaintiff, by application to the court, under sections 121 and 289 of the practice act (*Rev. pp. 867, 893*). And although the several suits be prosecuted in different courts, a court of law may, in virtue of its control over its own proceedings, in

its discretion, order a stay of proceedings in suits pending before it, until the rights of the parties are settled by the result in one action. The appropriate relief against successive suits by the same plaintiff for damages arising from an injury which is continuous, is, by application for the consolidation of actions, or for a stay of proceedings, and not by bill in chancery, unless the right in controversy has once been determined adversely to the plaintiff. *Eldridge* v. *Hill, 2 Johns. Ch. 281; Thompson* v. *Engle, 3 Gr. Ch. 271.*

The question, then, will be, whether four suits pending (one by McFarlan, one by the Halseys, one by Van Winkle and one by Hoagland) will, under the circumstances of this case, justify resort to a bill of peace.

A bill of peace, enjoining a litigation at law, is allowable only when the complainant has already satisfactorily established his right at law, or where he claims a general and exclusive right, and the persons who controvert it are so numerous that the endeavor to establish the right by actions at law would lead to vexatious and oppressive litigation, and renders an issue under the direction of the court indispensable to embrace all the parties concerned, and to avoid multiplicity of suits. *Tenham* v. *Herbert, 2 Atk. 483; Eldridge* v. *Hill, ubi supra.*

The object to be attained by resort to a court of equity, in such cases, is, to obtain a final determination of the particular right in controversy, as between all the parties concerned, by a single issue, instead of leaving the right open to litigation by separate suits brought by each of the parties in interest. To justify a bill of peace, therefore, there must be in dispute a general right in the complainant, in which the defendants are interested, of such a character that its existence may be finally determined in a single issue. It is not indispensable that the defendants should have a co-extensive common interest in the right in dispute, or that each should have acquired his interest in the same manner, or at the same time, but there must be a general right in the complainant, in which the defendants have a

common interest, which may be established against all who controvert it, by a single issue.

A reference to a few of the prominent cases will illustrate the principles on which bills of peace are founded. In *Sheffield Water Works* v. *Yeomans, L. R. (2 Ch. App.) 8*, a bill was filed by the complainants against Yeomans and five other defendants, and all other persons interested in certain certificates, which the bill prayed might be decreed to be void. The bill stated that a reservoir, belonging to the complainants, had burst, occasioning an inundation, whereby many persons lost their lives, and the property of very numerous persons was damaged; that, by act of parliament, commissioners were appointed to inquire into the damages occasioned by the inundation, and, where any claim of damages was assented to by the company, or assessed by the commissioners, the costs of the claimants were to be paid by the company, and the commissioners were to certify accordingly, for which costs, if not paid within a limited time, judgment might be entered against the company. The commissioners made out fifteen hundred certificates, which they lodged with Yeomans, who was town clerk. These certificates the complainants alleged to be invalid. The bill was filed to enjoin the delivery of the certificates, and for a decree that they should be delivered up to be cancelled. The defendants demurred. In overruling the demurrer, Vice-Chancellor Kindersley said: "There were in this case a number of persons, each alleging that he was entitled, as against the company, to be paid a certain sum, to be ascertained, in respect of costs; each claim was founded on the same state of circumstances, and what would be successful in one case, would be so in all; each insisted that he was entitled to have out of the custody of the town clerk these documents, in order to adopt the process under the act to recover the costs, that is, to go to the taxing-master and get judgment entered up, and issue execution; it was, therefore, the case of one body against a number of separate individuals, each claiming, as against

the one body, a certain right, the right being the same in all, and the same reasons and arguments applying to all; now, the question was, whether this was not precisely a case for a bill of peace, *quoad* the form and nature of the bill: where there were a number of persons' claiming as against one, or one person against a number, and where all were claiming alike, that was a case for a bill of peace." On appeal, the decree of the vice-chancellor was affirmed, for the reason that the rights of the numerous claimants all depended upon the same question—the validity of certificates sealed under the circumstances stated in the bill.

The case of *The N. Y. & N. H. R. R. Co.* v. *Schuyler, 17 N. Y. 592*, is another apt precedent on the same subject. The complainant was a corporation, whose capital stock was limited by its charter to $3,000,000, represented by thirty thousand shares of stock. The bill charged that Schuyler, the president and transfer agent of the company, had fraudulently over-issued certificates of stock for his own private purposes, amounting to nearly $2,000,000. Three hundred and twenty-six persons were joined in the suit as defendants, for the reason that they were holders of certificates of stock fraudulently issued. It was alleged that some of the defendants took these certificates knowing they were fictitious; some with reason to believe so; some on usurious contracts; many under circumstances which should have put them on inquiry, and many others under circumstances and upon considerations unknown to the complainants. Some of the defendants had brought suit, and other suits were threatened. The bill joined Schuyler and all the alleged owners and holders of this over-issued stock as defendants. It prayed that the certificates might be decreed illegal and void, and be surrendered up and cancelled, and that those who had sued the company might be enjoined from further proceedings therein; and that those who had not sued might be enjoined from bringing actions. On demurrer by one of the defendants, who was the holder of some of the spurious stock, the bill was held

to have been properly filed against all the defendants, for the reason assigned by Comstock J., in pronouncing the judgment of the court, that there was a single interest in the complainants directly opposed to the interests of all the defendants. The common point and center of the litigation was the stock, property and franchises of the corporation in which the defendants claimed specific shares and proportions, as holders of the false certificates. The rights claimed by the defendants were distinct, because they rested upon separate instruments as the evidence thereof; but they were of precisely the same nature, as they turned upon the same question, and were a cloud upon the same estate. Each certificate was a false muniment of the holder's title to a particular interest in the corporate estate vested as a unit in the corporation, but equitably belonging to the holders of its actual stock. And all the parties could be united because there was such a unity in the controversy with them all as to render it proper that they should be joined in a single suit.

*Fellows* v. *Fellows*, *4 Cow. 682*, is a case possessing the same characteristics as the one last cited. It was a bill against the several holders of property fraudulently transferred in separate parcels to each, and the bill was sustained because there was one connected interest in all the defendants centering in the point in issue in the case, one common subject of litigation on which the several titles of the defendants depended, which could be determined, and the whole litigation disposed of in the one suit, the result of which would settle the rights of all the parties.

On the other hand, where the interests of the several defendants are entirely distinct and unconnected, and do not present one common subject of litigation, though they relate to the same claim of right in the complainants, such defendants cannot be joined in the same suit. Thus, a bill will not lie against the several tenants of a manor for quit-rents, for the reason that no one issue could have tried the cause between any two of the parties, and no principle

would justify the bringing in of two different tenants of distinct estates to hear each other's rights discussed. *Bouverie* v. *Prentice, 1 Bro. C. C. 200.* If a copyright be infringed by different booksellers, the owner of the copyright can not join all the wrong-doers in the same bill; as the rights of each of the parties stand upon a distinct ground. *Dilly* v. *Doig, 2 Ves. 486.*

In *Rayner* v. *Julian, 2 Dick. 677,* Kenyon, M. R., puts the case of the sale of an estate in lots to different persons, and says that the vendor could not include all the purchasers in one bill for specific performance, as each party's case would be distinct, and depend on its own circumstances. And in *Brookes* v. *Lord Whitworth, 1 Madd. 85,* a demurrer for multifariousness on that precise ground, was allowed.

*Whaley* v. *Dawson, 2 Sch. & Lef. 367,* is a case where a demurrer was allowed, although the complainant had grounds for relief against all the defendants, with respect to the same estate ; for the reason that there was no common subject matter of litigation in which all the defendants were interested, and one set of defendants could not be involved in the litigation of a question that related exclusively to the other.

Indeed, the rule with regard to multifariousness, whether arising from the misjoinder of causes of action, or of defendants therein, is not an inflexible rule of practice or procedure, but is a rule founded in general convenience, which rests upon a consideration of what will best promote the administration of justice without multiplying unnecessary litigation on the one hand, or drawing suitors into needless and unnecessary expenses on the other. *Story's Eq. Pl.* § *539.* Enough has been said to show that, in allowing or disallowing objections of this kind, the courts are guided by the consideration whether there is a subject matter in dispute, in which all the defendants are interested, which is capable of being determined in a single issue, and the determination of which, in that method, would not involve the defendants severally in the needless expenses of the litiga-

tion of matters in which they have no concern. The author-
ities on this subject are quite numerous.  A citation of a few
of them, in addition to the cases already referred to, is all
that is proposed.  *Mayor of York* v. *Pilkington, 1 Atk. 282–4 ;
Ward* v. *Duke of Northumberland, 2 Anst. 469 ; Weale* v.
*West Middlesex, 1 Jac. & W. 358, 369 ; Campbell* v. *Mackay,
1 Myl. & Cr. 603 ; Powell* v. *Earl of Powis, 1 You. & Jer.
159 ; Com'rs of Sewers* v. *Glasse, L. R. (7 Ch. App.) 456 :
Same* v. *Gellatly, L. R. (3 Ch. Div.) 610–615 ; Brinkerhoff*
v. *Brown, 6 Johns. Ch. 139 ; Story's Eq. Pl.* §§ *271–286, 530–
539 ; Mitford's Eq. Pl. 182 ; Cooper's Eq. Pl. 182 .*

The question has generally arisen on demurrers to bills in
causes of purely equitable cognizance.  But in this respect
there is no difference  between such bills and  bills of peace.
A bill of peace which shall draw within equitable cognizance
causes of. action which are purely legal in their character,
must conform to the rules and principles of ordinary equity
pleading, and, in addition thereto, must possess another
element arising from the number of the parties interested
and the multitude of actual or threatened suits.  In such
cases there must be such a unity of interest on the one side
or the other, as would justify a joinder of the parties in
causes of purely equitable cognizance.  *17 N. Y. 608, Com-
stock, J.*

Passing by the small number of persons who appear to be
in anywise interested in this controversy, and regarding
only the substance of the bill upon its merits, it is plain that
this bill can not be maintained.

In considering whether there is a subject matter in dis-
pute in which the defendants are interested, that is common
to all the parties, and upon which their several suits at law
hinge, their actions must, for the purposes of this record, be
grouped into two classes, those brought by McFarlan being
placed in one class, and those by the Halseys and  their
tenants in the other.  The only fact that is common to the
suits of the parties respectively is, that the company erected
its dam, and placed flash-boards upon it, and that the parties

respectively claim that an injury resulted therefrom which gave to them severally a legal cause of action. But the right of the company to erect its dam, and place flash-boards upon it, and thereby appropriate the waters of the Rockaway river to its use for its canal, to the injury of private individuals, is not a matter in actual dispute. The company, in virtue of the terms of its charter, had authority to construct its dam and appropriate the waters of the river to the uses of its canal, without being wrong-doers, subject only to compensation for injuries to individuals, to be recovered by appropriate actions at law. *Lehigh Valley R. R. Co. v. McFarlan, 4 Stew. 706.* No issue at law is necessary to determine that question, nor could its determination, one way or the other, affect the right of the defendants to prosecute their actions. The company's charter, which authorizes the appropriation of private property to its use without compensation first made, also gives individuals who are injured, a right of action to recover compensation for their injuries. Whether the actions brought by the defendants are in proper form, and the principles upon which damages are to be assessed in case the issues are brought to trial, and a good cause of action shown, are questions of law to be decided by the courts in which the actions are pending.

Nor does there appear, by the pleadings, to be such a unity, either in the grounds on which the actions of the defendants are rested, or in the defences proposed, as would make a bill of peace and an issue thereunder, the appropriate method of settling the questions involved. McFarlan claims that he was injured by back-water arising from the increase in the height of the water in the pondage of the dam. The Halseys, and those who represent them, claim that their injuries were caused by the diversion of the waters of the river for use on the lower level of the canal. The Halseys suffered no injury from the increase in the height of water above the dam, and McFarlan's injury is in nowise attributable to the abstraction of water from the

river for use upon the lower level of the company's canal, and which may, to some extent, have been caused by the mode in which the lock and gates at the other extremity of the level were managed. The causes from which the injuries to the parties respectively resulted, instead of being coincident, are divergent. Holding the water at an increased height in the dam, or even in the lower level of the canal, would occasion no injury to the Halseys as the owners of water rights lower down on the stream, and McFarlan is not, in any manner, interested in the quantity of water abstracted from the river which flowed through the lower level, and was discharged into the company's canal beyond. If the flash-boards should be removed, and the back-water be thus withdrawn from McFarlan's premises, that might not prevent the diversion of which the other defendants complain. And, if the guard-lock at the outlet from the river, or the lock and gates at the other end of the level, should be so managed as to avoid the diversion from the river of more water than is brought into it by the canal from above, and thus the grounds of complaint by the Halseys should be removed, the injury to McFarlan by back water would still continue, if the dam was maintained at its present height. The trial of an issue in which McFarlan and the Halseys were the parties on one side, involving the causes of their injuries respectively, would necessarily lead to the introduction of evidence and the investigation of issues pertinent to the complaint of the one party, and wholly irrelevant to that of the other; and in some respects their interests would necessarily clash. On the trial of such an issue, it would be to the interest of McFarlan to show the great volume of water discharged over the dam, as bearing on the height to which the water was held above the top of the dam, and the interests of the Halseys would be promoted by showing precisely the reverse.

The proposed defence to the McFarlan suit is, that the dam was originally erected by the license and consent of

McFarlan's ancestor, from whom he derived title, and that McFarlan was himself a director of the Morris Canal & Banking Company in 1845, when the canal was enlarged, and was fully cognizant of the affairs of the company, and participated in the actions of the company in increasing the capacity of its canal, and the reconstruction of the locks and planes whereby an increase of the height of the water at the crossing of the canal, over the Rockaway river, by the use of flash-boards on the top of the original dam, became necessary; and that he is equitably estopped from complaining that the use of flash-boards, and the consequent flooding of his mill by back-water, was without his consent. On the other hand, to the Halseys' suits, and those of their tenants, the defence is, that no more water was taken from the river than was brought into it by the canal from its supply at Lake Hopatcong, and that the company obtained from Joseph Jackson and John D. Jackson, who were formerly the owners of the premises, a grant in the nature of a perpetual license to maintain said dam and flash-boards, which grant or license, by lapse of time, has become lost. The defendants have no common interest in any of these defences, nor is the other defence of a prescriptive right, which the complainants propose to make to all the suits, one in which the defendants have a common interest. The theory on which title by adverse possession or prescription rests is, that there has been a possession or enjoyment for the full period of twenty years, continued and uninterrupted, adverse to the interest of the true owner, in which he has acquiesced, on which the law presumes a grant which has been lost. A claim of title or right derived from such a source is individualized and personal as against the owner of each separate parcel of land to which such a claim of title or right is made. The possession may have been permissive, and, therefore, not hostile to the owner of one parcel and not as to the other. It may have been interrupted by the owner of one parcel so as to destroy the continuity of possession and enjoyment of

one parcel and not of the other; and personal disabilities may have suspended the operation of the statute as to the one and not as to the other. It is manifest that the trial of all three distinct issues in one issue, under the direction of the court of chancery, would be impracticable.

The decree of the chancellor, dissolving the injunction and dismissing the bill, should be affirmed.

Decree unanimously affirmed.